UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) | No. 6:24-CR-25-CHB-HAI |
| v. | ) ) | |
| SAMUEL H. YOUNG, | ) ) | RECOMMENDED DISPOSITION |
| Defendant. | ) ) ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Defendant Samuel Young is representing himself.  D.E. 68.  He is charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g).  D.E. 1.  On March 13, 2024, Young led police on a multicounty vehicle chase down Interstate 75.  After officers finally stopped Young's vehicle and arrested him, officers retrieved a 9mm pistol and ammunition, among other evidence.  Young now moves to suppress the evidence in support of the § 922(g) charge, arguing the search and seizure violated his Fourth Amendment rights.

The crux of the matter is this:  multiple officers reported seeing Young, during the vehicle chase, extend his hand out the window and/or sunroof of his SUV, holding a pistol.  Young's motion claims that he was not brandishing a pistol; rather he was making gestures at the officers with his empty hands.  He argues that, because he was not seen waving a pistol, officers lacked probable cause to search his vehicle for evidence of a crime.  He also argues the discovery of the pistol was not the result of a lawful search incident to arrest and that the pistol was not in plain view.  Young's claims created a factual dispute that needed to be resolved via a live hearing.  The Court now finds, by a preponderance of the evidence, that the government has met

its burden of justifying the seizure of the pistol and the motion to suppress should be denied on the merits. The pistol was in plain view. And, even if not, any search of the vehicle was justified under the automobile exception and as a search incident to arrest.

## I. BACKGROUND

The following facts are not in dispute. On March 13, 2024, law enforcement observed Young following too closely to a semi truck in a vehicle with no license plate and a cracked windshield. They initiated pursuit. The pursuit began southbound on I-75 near mile marker 85. After multiple failed attempts to deflate Young's tires using "stingers" or spike strips, Young's tires were finally punctured near the London exit at mile 41. Once stopped, Young refused to exit the vehicle. An officer breached Young's passenger-side window and inserted a police dog into the car, which attacked Young. In the fray, the dog kicked several items out of the vehicle, including a backpack.

One of the officers at the scene, Broadhead Police Chief Gary Alcorn, reported that he saw the butt of a pistol protruding from Young's backpack while it lay on the ground. (Young insists the pistol was not visible but was inside a closed backpack). Alcorn says he retrieved the pistol, ensured it contained no ammunition, and placed the unloaded pistol in the front passenger seat of Young's vehicle, where other officers later seized the items as evidence.

State charges were lodged against Young, which include:

( 1)    license plate not legible;

(2)    obstructed vision and/or windshield;

(3)    fleeing or evading the police, first degree;

(4)    wanton endangerment, first degree;

(5)    wanton endangerment, second degree-police officer;

2

(6)  possession of marijuana;

(7)  possession of a handgun by a convicted felon;

(8)  criminal mischief; and

(9)  resisting arrest.

The charge of first-degree wanton endangerment is relevant here, as the government argues officers had probable cause to search Young's SUV for evidence of Young brandishing a gun in public.

The record is clear that the officers involved in Young's arrest did not know Young's identity and did not know he was a felon until after Young was arrested and the handgun was seized. This fact was well-established at the evidentiary hearing and is uncontested.

The federal Indictment issued April 25, 2024, and the state charges were dismissed. The Indictment charges that, on March 13, 2024, Young, "knowing he had previously been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed a firearm, that is, a SCCY, CPX-2, 9mm pistol . . ., and the firearm was in and affecting commerce, all in violation of 18 U.S.C. § 922(g)(1)." D.E. 1.

At Young's initial appearance on May 23, the Court appointed Paul Croley as Young's CJA counsel. D.E. 10. On June 5, the Court received a *pro se* motion from Young seeking a different lawyer. D.E. 14. Magistrate Judge Atkins conducted a hearing and granted the motion. D.E. 23. The Court appointed Travis Rossman as Young's new counsel on June 18, 2024. Mr. Rossman soon thereafter moved to continue the trial and the defensive-motions deadline, and the Court granted both. D.E. 29.

On July 12, Young, through Mr. Rossman, moved to dismiss the Indictment under an as-applied Second Amendment challenge. D.E. 30. The government responded in opposition (D.E.

32) and Young replied (D.E. 33). But then Young moved again for new counsel. D.E. 36. The undersigned held a hearing and denied the request. D.E. 37.

Mr. Rossman then moved for a competency examination. D.E. 38. The Court granted that motion, and Young was sent to FMC Lexington. D.E. 49. On October 29, 2024, the Court received a forensic report finding Young competent to proceed. D.E. 61. The parties stipulated to the report's findings, and Young was declared competent to proceed. D.E. 63, 64. Because dissatisfaction-with-counsel issues emerged at the competency hearing, the Court then conducted another dissatisfaction hearing (D.E. 66) and denied Young's second request to remove Mr. Rossman (D.E. 67). However, because Mr. Young had also expressed interest in representing himself, the Court then conducted a *Faretta* hearing and, on December 3, 2024, granted Mr. Young's request to proceed *pro se*. D.E. 68.

Young then represented himself at Judge Boom's hearing on his Second-Amendment motion. D.E. 74 (minutes), 79 (transcript). Judge Boom denied Young's motion to dismiss on February 26, 2025. D.E. 81. At a March 11 hearing, Judge Boom set a new trial date of June 17, 2025, and a new defensive-motions deadline of Tuesday, March 18, 2025. D.E. 84.

On Monday, March 21, 2025, the Court received Young's *pro se* motion to suppress (with memorandum in support), now under consideration. D.E. 86. The motion is obviously a typewritten motion previously prepared by Mr. Rossman. Each page has "DRAFT" stamped at the top. The motion and memorandum both have a handwritten notation in the end, which states: "Dated March 16th 2024 Samuel Young." D.E. 86 at 2; D.E. 86-1 at 8. There is also something of a handwritten addendum, also "Dated March 16th 2024 Samuel Young." D.E. 86-1 at 9. Young's envelope had no postmark.

The government objected to the motion on timeliness grounds. D.E. 87. "March 16th 2024" was obviously well over a year ago. It is not clear whether Young was trying to certify he was placing the motion in the prison mail on March 16, 2025, which would be the Sunday prior to the deadline of Tuesday March 18. The Court ordered Young to reply and address the timeliness concerns. D.E. 89.

To be clear, Young does not question the validity of the *stop* of his SUV. Rather, he argues any *search* of his SUV or other property and the seizure of the firearm-possession evidence violated his Fourth Amendment rights. He seeks suppression of the fruits of the search and any derivative evidence. D.E. 86. There is no dispute that any searching or seizing on March 13, 2024, was warrantless and non-consensual. The government argues in opposition that the officers had probable cause to believe the vehicle contained evidence (*i.e.*, the gun) of wanton endangerment (*i.e.*, brandishing a gun while driving), and any search/seizure was thus justified under the automobile exception. D.E. 87. The government also argues the gun was in plain view (sticking out of Young's backpack) and the search and seizure of the weapon were lawfully done as incidental to the arrest. *Id*. There is no suggestion that this case involves an inventory search.

The Court conducted an evidentiary hearing on Monday, April 21, 2025. D.E. 92. On the same day, the Court received Young's reply memorandum. D.E. 91. The Court did not order further briefing, but informed the parties that this recommendation would be forthcoming.

## II. Timeliness of the Motion to Suppress

During an in-person hearing on March 11, 2025, Judge Boom ordered that any motion to suppress be filed by March 18, 2025. D.E. 84. The Court received Young's motion to suppress on Friday, March 21. D.E. 86. Young is confined at Grayson County Detention Center, so he

5

has the benefit of the prison mailbox rule. *Houston v. Lack*, 487 U.S. 266 (1988) (holding that prisoners' filings are deemed filed at "the moment of delivery to prison authorities for forwarding").

Young explained at the hearing that the handwritten notations on his motion and memorandum were intended as a certification that he delivered these materials to jail staff on Sunday, March 16, 2025. Additionally, Young also certifies in his reply memo that he delivered the suppression motion to jail staff on March 16 (which in context would be 2025). D.E. 91 at 4-5. In the Court's experience, it is not unusual for mail to take five days to travel from the Grayson County Detention Center to the London federal courthouse. Indeed, Young's reply memo was delivered six days following his certification of delivery to jail staff. D.E. 91 at 7. The Court considers the motion and reply timely filed.

### III. Facts

Two disputed clusters of facts are relevant to the arguments raised in Young's motion to suppress. The first concerns the government's contention that the "vehicle exception" and "search incident to arrest" exception apply in this case. As will be explained more fully below, to win on these theories, the government needs to show that officers reasonably believed that Young was waving a handgun out of his car during the pursuit, thereby committing the crime of wanton endangerment. And the gun itself would then be evidence in support of a wanton-endangerment charge. If officers reasonably believed Young could have been wantonly endangering the public, then they would have probable cause to search his vehicle for the pistol.

The second disputed cluster of facts concerns the location and visibility of the pistol when it was found. Here, the government needs to present facts supporting the plain-view exception.

6

## A.  Law Enforcement Reports

The government attached to its response brief reports from four officers involved in the March 13, 2024 chase.  The same four officers testified at the evidentiary hearing.  Three of the reports include an eyewitness description of Young brandishing a handgun while driving.  The fourth report describes the discovery of the gun, partially visible in plain view.  Young disputes aspects of these reports.

First is the report of then-Kentucky State Police ("KSP") Trooper Dackery Larkey. According to his report, prepared on the date of the incident,

> During the pursuit, I first observed what appeared to be the operator brandish a firearm from the sunroof of his vehicle in the upward position.  This occurred at or near the 80 mile marker.  The subject was not driving in an erratic manner, rather failing to stop and traveling between 75-92 mph at this time.  The operator would signal when changing lanes and I then noticed the operator had his driver's window down.
>
> At or near the 74 mile marker I observed the operator stick his hands outside the drivers window, one instance even appearing to brandish a handgun.
>
> . . . .
>
> Prior to passing the 62 mile marker, the operator once more brandished what appeared to be a handgun through the sunroof of the vehicle.
>
> . . . .
>
> While mirroring the subject, I observed the operator reach towards the backseat and passenger seat numerous times.
>
> . . . .
>
> I observed the operator once again brandish a handgun from the sunroof of the vehicle at or near the 50 mile marker.
>
> At this point, the operator had brandished a handgun in three (3) counties while being engaged in a pursuit.

7

D.E. 87-1 at 7-8.  Trooper Larkey also reported that a 9mm handgun "was discovered in the front passenger seat area by Laurel County Sheriffs Department."  *Id*. at 8-9.  Trooper Larkey's citation also states, "Subject passed through 3 counties, (Madison, Rockcastle & Laurel) where subject routinely held his hand through the sunroof with a handgun.  Subject would also lower his drivers side window and put [sic] with gun outside."  *Id*. at 10.

Next is the report of Mount Vernon Police Officer Joe Rush, prepared on May 27, 2024. It states,

> I went to the exit 62 and got on the southbound on ramp and was going to try and throw spikes when the units went by.  I observed the Black Range Rover traveling South Bound and the traffic was too congested to make a successful attempt with the spikes.  As the Black Range Rover approached my location I was looking in its direction and observed the driver stick his arm and hand up through the sunroof of the vehicle with what appeared to be a handgun.  At that time I did not know if the suspect was going to attempt to fire the weapon and I proceeded to run around to the other side of my patrol vehicle to take cover.  After gaining cover the vehicle and the other units had passed and continued on Southbound on I 75.

D.E. 87-2.

The third report is from KSP Trooper Michael King.  In his March 18, 2024 report, he states:

> A couple miles into the pursuit, I pulled up alongside the vehicle and the driver looked over and smirked and then continue[d] to look ahead.
>
> The pursuit continued into Rockcastle County and at one point I was lead vehicle due to driver switching lanes.  I observed the driver stick his hand out the window and it appeared he was brandishing a firearm.  He did this on two different occasions.

D.E. 87-3.

Finally, there is a report from Gary Alcorn of the Brodhead Police.  On May 6, 2024, he wrote:

On March 13, 2024, I assisted KSP, and other agencies, with a pursuit on I-75 that involved a subject that was brandishing a firearm. The pursuit ended at the 38 mile marker. As the troopers were getting the subject out of the vehicle, I approached and posted on the passenger side of the vehicle. After the subject was in custody, I saw that there were clothing and a backpack on the ground outside of the passenger side door. When I looked down at the backpack, I saw the butt of a pistol. I retrieved the firearm, cleared it and put it on the passenger seat. I also found several bills of different dominations in the backpack. I handed the bills to a trooper that was collecting various bills found and informed him that I had found the firearm. I informed the trooper of where the firearm was found, that it was cleared and on the passenger seat. Due to the number of officers and troopers already on scene and the fact that the scene was safe. I disengaged from the scene and cleared. I then returned back to Brodhead, Ky.

D.E. 87-4.

## B. Hearing Testimony

At the April 21 hearing, all four officers testified consistently with their written reports. Young cross-examined each of them. Young did not testify or enter any other evidence in the record.

The first witness was Michael King (report at D.E. 87-3). Although he currently works for the Mount Vernon Police Department, he was a KSP trooper from June 2005 to July 2024. At the time of the incident with Young, King was part of the drug-enforcement interdiction team. This team is dedicated to monitoring the interstate to deter accidents and crimes. He has been trained to identify "abnormal" and potentially "clandestine" activity by motorists. On March 13, 2024, he was sitting at a cut-through near the 86-mile marker on Interstate 75, watching southbound traffic. Trooper Larkey was also nearby in a separate vehicle.

As the government played portions of his dash-cam recording, Officer King testified that he noticed Young's black SUV following too closely to a tractor-trailer. As the vehicle passed, King also was unable to see any registration plate. King and Larkey decided to pull Young over. Despite both officers activating their lights and sirens, Young did not stop. King testified that he

pulled up next to Young's SUV in an attempt to identify the driver, see if he was wearing a seatbelt, and see if there were any passengers, particularly any children.  King testified that Young looked over at him, smirked, and then continued driving.  King tried to get the driver's attention, to gesture at him to pull over.  King testified he had no doubt the driver knew they were trying to pull him over.  He did not think his gestures could be interpreted as something like a friendly salute.  The vehicles, soon joined by other law enforcement, were traveling around 82 to 85 miles per hour.  Officer King testified that in his experience, even inexperienced drivers will pull over when followed by police officers with lights and sirens activated.  He said that typically, motorists will pull over within one or two miles, or at the nearest exit.

About thirteen minutes into the chase, tire-deflation spikes were thrown into the road, but Young swerved into the emergency lane and avoided them.  About fifteen minutes in, Mount Vernon Police (including Chief Joe Rush) were waiting by the road to throw spikes, but they did not throw them.  An additional set of spike strips was then thrown.  This time, Young avoided them, but Officer King did not.  About this time, King testified, he saw Young stick a firearm out of the sunroof.  King said this was the second time Young had done this, but he did not remember precisely at what point King first brandished a gun.

King testified that what he saw in person was much clearer than what was recorded on his dashcam video.  King testified that he saw Young extend a gun out of the vehicle twice, but at least the first instance is not visible on the video at all.

After his tires were punctured, Officer King pulled over at the Exit-59 off-ramp.  He later arrived at the hospital and monitored Young for a while before Young was discharged.  King transported Young to jail.  King said that Young was "not very cooperative" with him, and he heard that Young had been "belligerent" with hospital staff and refused treatment.  King testified

10

he did not participate in any identity check of Young.  He had no knowledge of how officers learned of Young's prior felony conviction.

During cross-examination, the government zoomed in (at Young's request) on the video during the fifteen-minute mark, where objects can be seen protruding out the sunroof of Young's vehicle.  This was shortly after Officer King ran over the tire-deflation device.  It appears that Young at this point stuck both hands out the sunroof.  Officer King testified that, after watching the zoomed-in version, he no longer believed Young was brandishing a handgun at that particular moment (shortly after King hit the spike strips).  Nevertheless, Officer King testified on redirect he "wholeheartedly" believed he saw a firearm on at least one occasion during the chase, and he still believes Young stuck a handgun out the sunroof.  Particularly, King remembered seeing the gun at an earlier point.  But Officer King said he had reviewed the video prior to the hearing and could not see this gun-brandishing incident in the recording.

The second witness was Mount Vernon Police Chief Joseph Rush (report at D.E. 87-2).  He has spent 24 years in law enforcement, including the last two years as Police Chief.  He testified that, when he heard about the KSP vehicle pursuit on March 13, he went to Exit 62 to try to throw spike strips.  However, with so many vehicles passing, he did not believe it was safe for him to throw the strips.  He said he had a clear view of the black Range Rover as it passed.  He said he saw the driver stick "a hand, what appeared to be a weapon, out of the vehicle."  Chief Rush then ducked and got behind his vehicle "for cover."  He said, "I seen the weapon come up through the sunroof of the vehicle."  Chief Rush then followed the pursuing fleet but had no further involvement in the case aside from writing his later report.

Rush testified on cross-examination that the SUV was traveling "very fast," at least "over fifty," and he saw the gun for one to two seconds.  He agreed there was a "possibility" he was

11

mistaken about what he saw.  But he had carried a firearm for 24 years, and believes he knows one when he sees one.  Chief Rush said he reviewed Officer King's dashcam video the previous week, but he could not see the gun on the video that he had seen the day of the chase.

The third witness was KSP Trooper Dackery John Larkey (report at D.E. 87-1).  Larkey has been with KSP for almost eleven years, with the last three on the interdiction team, as also described by Officer King.  Trooper Larkey testified that on March 13, 2024, he noticed a black Range Rover in the center lane following too closely behind a semi truck.  The driver looked at Larkey as he passed.  And no license plate or registration decal was visible.  Larkey then followed for a while.  He testified he saw numerous traffic violations before he activated his lights, including a visible crack running down the SUV's windshield.

The government played segments of Trooper Larkey's dashcam footage as Larkey described the events.  Larkey said he could see things much more clearly in person than what was recorded by the camera.  Larkey testified that, as he pursued Young, he saw Young put a handgun through the sunroof.  He then increased the distance between the vehicles, for safety.  He also said he saw Young reaching for something in the back of his vehicle.

Trooper Larkey testified that the gun is not visible in the dash cam video, but this fact does not surprise him.  Larkey said that, due to low resolution and motion blur, a person cannot even make out highway signs in the video.  Larkey testified he is 100% sure he saw a firearm go up through the sunroof around mile 80 to 78.  At another point, the driver's window was down.  And Larkey said he saw a hand with a firearm protruding, pointed straight at the side.  As the pursuit continued, Larkey cautioned other officers not to get right beside Young's vehicle due to the firearm.  Larkey testified he saw the firearm come through the sunroof again around the time

they passed Chief Rush.  Trooper Larkey saw the gun a fourth time around the 50-mile marker, about twenty minutes into the chase.

About 27 minutes into Trooper Larkey's dashcam video, Young's tires are finally punctured near Exit 41.  Officers then executed a "rolling roadblock," boxing in Young's car. But Larkey said he did not get right beside the vehicle, as he normally would, "because of the firearm."  Trooper Larkey saw other officers surrounding Young's SUV, with weapons drawn, yelling for Young to get out.  Larkey also got out of his cruiser and "took cover."  He was very concerned about "officer safety" at that point, "due to the firearm."  Trooper Larkey described watching other officers wrench Young out of the vehicle after Trooper Gabriel sent his K-9 through Young's passenger-side window.  Trooper Larkey also later took photographs of evidence collected from the SUV, including the pistol and ammunition.  He did not collect this evidence; he only photographed it after other officers placed the evidence on an automobile hood.

On cross-examination, Trooper Larkey testified that he watched his dashcam video and could not see Young brandishing the pistol.  But, he says, he saw Young do this with his "two eyes."  Larkey still believed he saw Young stick a pistol out of the video, for example, near the fifty-mile marker.  He testified this his written report concerning seeing a gun near mile marker 62 was based on his own observation.

Trooper Larkey said, consistent with other witnesses, that the pistol was found prior to law enforcement discovering that Young was a felon.  Specifically, Young's criminal-history report was not disseminated until after Young arrived at the hospital.

The fourth and final witness was Gary Wayne Alcorn, Chief of the Brodhead Police (report at D.E. 87-4).  He has been in law enforcement over 20 years, with the last three years as

13

chief of police. He also had ten years of military service. He testified that, after he heard radio traffic about pursuit of someone brandishing a firearm, he caught up with the group around the 38-mile marker, where Young's vehicle had already been brought to a stop. After the dog was deployed against Young and returned to the K-9 vehicle, Chief Alcorn went to the passenger side of Young's now-vacant SUV. The door was open. On the ground were items including a heavy coat, a backpack, and some loose trash. Young was already arrested at this point. Alcorn testified he did not see the dog kick the backpack out of the SUV. All he knew was how he saw the backpack (holding the gun) on the ground when he approached.

Alcorn said the backpack was unzipped and he could see the butt of what he believed to be a pistol. Alcorn had not moved the backpack. The way the backpack was open and "folded back," the pistol butt could be plainly seen. Only the handgrip was exposed in plain view. But it was "obvious" he was looking at a firearm. Alcorn picked it up and "made it safe." He cleared the gun, locked the slide back, and made sure there was no magazine. Alcorn found that the pistol contained no magazine and no ammunition. Alcorn placed the pistol in the vehicle's passenger seat. He then searched the jacket and backpack. He found some cash, which he handed to a state trooper (someone Alcorn did not know) and told the trooper he had cleared the firearm and placed it in the passenger seat. Chief Alcorn had no body camera. He later wrote his report at the request of DEA Special Agent Bennett. Alcorn wrote the report himself. No one told him what to write. And Alcorn had no idea what any other officers might have written concerning the discovery of the weapon.

At Young's request, the government also played a portion of the bodycam footage from K-9 Trooper Gabriel. During the recording, Trooper Gabriel (with his camera) was immediately behind the canine as it was deployed into Young's vehicle. After the dog went through the

14

window into the SUV, the passenger side door was opened. Then, one can plainly see the dog kicking the coat and backpack out of Young's SUV and onto the road.

## IV. The Automobile Exception

### A. Legal Standards

The government argues that the search was constitutionally permissible (1) under the vehicle exception to the warrant requirement; (2) as a search incident to arrest and (3) under the plain-view exception. The government bears the burden of showing that an exception to the warrant requirement applies and that the search or seizure complied in scope and duration with the Fourth Amendment. *United States v. Lott*, No. 6:17-CR-52-GFVT-HAI, 2018 WL 2348684, at *4 (E.D. Ky. Feb. 7, 2018).

The Fourth Amendment guarantees the right of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Generally speaking, a search is only reasonable under the Fourth Amendment if it is "conducted pursuant to a warrant issued by an independent judicial officer." *California v. Carney*, 471 U.S. 386, 390 (1985).

However, the "automobile exception" permits a warrantless search of an automobile if there is "probable cause to believe that instrumentalities or evidence of crime may be found in the vehicle to be searched." *United States v. Graham*, 275 F.3d 490, 509 (6th Cir. 2001). "Under the automobile exception to the warrant requirement, an officer may perform a warrantless search of a detained vehicle should the officer have probable cause to believe the vehicle contains contraband or evidence of criminal activity." *United States v. Lyons*, 687 F.3d 754, 770 (6th Cir. 2012). If probable cause exists to do so, officers may search for evidence of crimes other than the offense of arrest. *Arizona v. Gant*, 556 U.S. 332, 347 (2009).

15

> There is no requirement that the warrantless search of a vehicle occur contemporaneously with its lawful seizure. The justification to conduct such a warrantless search does not vanish once the car has been immobilized. A vehicle lawfully in police custody may be searched on the basis of probable cause to believe that it contains contraband, and there is no requirement of exigent circumstances to justify such a warrantless search.

*United States v. Johns*, 469 U.S. 478, 484 (1985) (citations and quotation marks omitted).

Probable cause means "'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'" *Graham*, 275 F.3d at 509 (quoting *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998)). Determining whether probable cause existed at the time of the police action is a commonsense, practical question to be judged from the totality-of-the-circumstances. *Smith v. Thornburg*, 136 F. 3d 1070, 1074-75 (6th Cir. 1998) (quoting *United States v. Wright*, 16 F.3d 1429, 1437 (6th Cir. 1994)). In determining whether probable cause existed, the Court "does not look to events that occurred after the search or to the subjective intent of the officers; rather, the Court looks at the 'objective facts known to the officers at the time of the search.'" *United States v. Smith*, 510 F.3d 641, 648 (6th Cir. 2007) (quoting *Smith v. Thornburg*, 136 F. 3d 1070, 1075 (6th Cir. 1998)). "Subjective intentions play no role in probable cause Fourth Amendment analysis." *Schneider v. Franklin County*, 288 F. App'x 247, 251 (6th Cir. 2008) (citing *Whren v. United States*, 517 U.S. 806, 812-13 (1996)). "Probable cause for arrest may emanate from collective police knowledge." *United States v. Redmond*, 475 F. App'x 603, 607 (6th Cir. 2012); *accord United States v. Duval*, 742 F.3d 246, 253 (6th Cir. 2014).

"The scope of a warrantless search of an automobile . . . is defined by the object of the search and the places in which there is probable cause to believe that it may be found." *United States v. Ross*, 456 U.S. 798, 824 (1982). In such cases, officers may search "any area of the

16

vehicle in which the evidence might be found."  *Gant*, 556 U.S. at 347 (citing *Ross*, 456 U.S. at 820-21); *accord United States v. Avant*, 650 F. App'x 890, 892 (6th Cir. 2016).  Furthermore, if police have probable cause to search a vehicle, "they may conduct a warrantless search of any containers found inside that may conceal the object of the search."  *Wyoming v. Houghton*, 526 U.S. 295, 301 (1999).

### B.  Analysis

Here, based on his alleged brandishing of a firearm while driving, Young was charged in state court with first-degree wanton endangerment.  D.E. 87-1 at 3, 10.  The government argues that law enforcement accordingly had probable cause to search Young's vehicle for evidence of this crime.

Under Ky. Rev. Stat. § 508.060(1), "A person is guilty of wanton endangerment in the first degree when, under circumstances manifesting extreme indifference to the value of human life, he or she wantonly engages in conduct which creates a substantial danger of death or serious physical injury to another person."

The government points out that brandishing a firearm in public can support a conviction for Kentucky first-degree wanton endangerment.  D.E. 87 at 10-11; *see also United States v. Harris*, No. 22-5951, 2023 WL 7219085, at *4 (6th Cir. Nov. 2, 2023), *cert. denied*, 144 S. Ct. 860 (2024); *Deskins v. Crouch*, No. 3:16-CV-83-GFVT-HAI, 2017 WL 9325351, at *4-5 (E.D. Ky. June 13, 2017), *report and recommendation adopted*, 2017 WL 3387134 (E.D. Ky. Aug. 7, 2017); *Kelly v. Commonwealth*, 655 S.W.3d 154, 162-63 (Ky. 2022).  "In general, examples of conduct which constitute wanton endangerment include discharging or **brandishing firearms in public**, using firearms or explosives in a grossly careless manner, and obstructing public

17

highways." *Hancock v. Comm.*, 998 S.W.2d 496, 498 (Ky. Ct. App. 1998) (emphasis added). And Young has not argued to the contrary.

The search was justified by the automobile exception. This is because law enforcement had a reasonable belief that Young had brandished a weapon while driving, thereby committing first-degree wanton endangerment. To be clear, the Court does not need to find that Young *actually* waved a gun out his window and sunroof during the chase. And the Court recognizes that Young's pistol, when discovered, was unloaded. The question, however, is whether officers had reasonable grounds for believing Young had brandished a firearm, supported by less than prima facie proof but more than mere suspicion.

Here, three officers testified they felt certain they saw Young stick his hand out of his vehicle while holding a pistol. Perhaps most compellingly, all three officers testified to seeing the gun around miles 62 to 59. Chief Rush was at exit 62 attempting to throw his "stop strips" when he saw the driver stick his hand out the window with a gun. In response, Rush took "cover" behind his own vehicle to avoid being shot. Trooper Larkey testified he saw Young holding the firearm around the time he passed Chief Rush. And Officer King also testified he saw Young holding a firearm earlier than the part of the video where two empty hands can be seen (which was near mile 59, a couple miles south of Chief Rush's location). All three officers, separated during each other's testimony, testified they were certain at the time that they had seen a handgun. Trooper Larkey explained in his report and testimony that he believed Young stuck a gun out of the car at least four times. The beliefs of these multiple eyewitnesses amount to more than a hunch. A reasonable person in their position could easily conclude Young's vehicle had a fair probability of containing evidence of wanton endangerment, *i.e.*, the handgun which had been brandished.

As previously noted, Young did not enter any evidence of his own. The testimony of the government's witnesses thus stands uncontradicted. Officers King, Rush, and Larkey all testified to personally witnessing Young brandish a handgun. King and Larkey said they saw him do this more than once. The Court finds credible these witnesses' uncontradicted testimony that they *believed* they saw Young brandishing a gun during the interstate chase. Accordingly, the government has met its burden of establishing probable cause to search Young's vehicle under the circumstances.

Young's focus during the evidentiary hearing was to depict the officers' testimony and reports that he was observed brandishing a firearm as not credible because that conduct is not seen in any of the video evidence. But being able to see it in that fashion is not required. The witnesses testified concerning their clear recollections and there is no actual evidence contradicting what they said occurred. They stated their visual perceptions at the time were much better than the video allows. Officer King did concede, once the video shown during his testimony was magnified, paused, and played in certain segments, that he thought one incident of perceived brandishing was not actually the display of a handgun. But this acknowledgment and candor bolsters Officer King's testimony instead of undermining it. In sum, the officers' testimony describing what they observed is not required to be perfectly corroborated by the video evidence, is not contradicted, and is more than sufficient to find, by a preponderance, that they believed they saw Young brandish a firearm.

### V.  Search Incident to Arrest

#### A.  Legal Standards

"[C]ircumstances unique to the vehicle context" justify the search of an arrestee's vehicle incident to a lawful arrest when it is "reasonable to believe evidence relevant to the crime of

arrest might be found in the vehicle." *Arizona v. Gant*, 556 U.S. 332, 343 (2009); *accord United States v. Alexander*, 954 F.3d 910, 917 (6th Cir. 2020).[1]  Thus, for a search to be justified as a search incident to arrest, (1) the arrest must have been lawful (*i.e.*, supported by probable cause and not otherwise unlawful), and (2) it must have been reasonable for the police to believe that evidence of the defendant's crime of arrest would be found in his vehicle.  *United States v. Williams*, No. 22-1365, 2023 WL 3815097, at *3 (6th Cir. June 5, 2023).  The search of the passenger compartment includes any containers included therein, even the glove compartment. *New York v. Belton*, 453 U.S. 454, 461 n. 4 (1981).

## B.  Analysis

The analysis here essentially overlaps with the analysis for the vehicle exception.  Young was lawfully arrested for multiple state crimes and violations, including felony first-degree wanton endangerment.  The dangerous behavior included Young allegedly brandishing a handgun while being chased down the interstate.  Young was lawfully arrested.  And it was reasonable for officers to believe that evidence, *i.e.*, the gun, would be found in his SUV.  Given the credible and uncontradicted evidence that Officers King, Rush, and Larkey believed they saw Young brandishing a handgun out his window and/or sunroof while driving, the government has met its burden of establishing a valid search incident to arrest.

## VI.  Plain View

## A.  Legal Standards

The plain view exception comports with the Fourth Amendment because observing or seizing an item in plain view does not involve an intrusion on privacy.  *See Horton v. California*,

---

[1] Under this exception, police may also search an arrestee's vehicle where the arrestee "is unsecured and within reaching distance of the passenger compartment at the time of the search."  *Gant*, 556 U.S. at 343.  This is not relevant here because Young was not unsecured at the time of the search.

496 U.S. 128, 133-34, 141 n.11 (1990). The plain view exception applies when the government shows four conditions are satisfied: (1) the object is in plain view; (2) the officer is legally present in the place from which the object can be plainly seen; (3) the object's incriminating nature is immediately apparent; and (4) the officer has a lawful right of access to the object. *United States v. Garcia*, 496 F.3d 495, 508 (6th Cir. 2007); *United States v. McLevain*, 310 F.3d 434, 438-39 (6th Cir. 2002); *United States v. Phillips*, No. CR 5:24-108-DCR, 2025 WL 560701, at *4 (E.D. Ky. Feb. 20, 2025).

## B. Analysis

Here, the plain-view exception is also satisfied. Chief Alcorn testified quite clearly that, when he walked up to the passenger side of Young's vehicle, the backpack was lying on the ground. At the time, he had no idea that the backpack had been kicked out of the SUV by the police dog. The backpack was open, and Alcorn could see the butt of a pistol. Alcorn testified he did not need to manipulate the backpack or move any obstruction to see the pistol. The object was thus in plain view. The officer, standing on I-75, was legally present. Alcorn had heard over police radio that the driver was brandishing a handgun, which is indicative of wanton endangerment. Accordingly, the pistol's incriminating nature was immediately apparent. Given the gun was lying on the ground on the roadway, Alcorn had a lawful right to pick it up and clear it. Chief Alcorn's testimony is credible. And it is not contradicted by any other evidence. Accordingly, the government has met its burden of demonstrating the plain-view exception applies.

## VII.  Additional Considerations

Young attempted to raise new theories and arguments in his reply brief and at the conclusion of the April 21 hearing.  The Court informed him that he was limited to the arguments raised in his initial motion.

The Sixth Circuit has consistently held that arguments made for the first time in a reply are waived.  *Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010) (citing *Am. Trim, L.L.C. v. Oracle Corp.*, 383 F.3d 462, 477(6th Cir.2004)); *see also Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) ("[W]e have found issues to be waived when they are raised for the first time in . . . replies to responses.").

For example, Young attempted to argue that the gun was excludable as evidence derived from unlawful excessive use of force during his arrest.  This argument is waived.  The Court also now briefly addresses it in the alternative.  At the hearing and in his reply memo, Young cited case law in support of this theory.  However, the case law cited does not establish the proposition that physical evidence is suppressible in a criminal prosecution on the basis of excessive use of force during arrest.  This is a criminal prosecution, not a civil-rights lawsuit.  And this is not a case that concerns an allegedly involuntary confession.  The appropriate remedy for excessive force is not suppression of physical evidence, but a civil action pursuant to 42 U.S.C. § 1983. *United States v. Partin*, No. 3:21-CR-58-TAV-CRW, 2025 WL 817431, at *5 (E.D. Tenn. Mar. 14, 2025).  Indeed, Young has initiated a civil-rights claim alleging excessive force during the stop and arrest.  *Samuel H. Young v. Kentucky State Police*, No. 6:25-CV-46-GFVT (E.D. Ky.). During the April 21 hearing, it appeared at times that Young was attempting to solicit evidence regarding his excessive-force civil-rights claim, but the Court did not permit this questioning.

22

Young also belatedly argues that officers, using the police dog, created the plain-view situation.  D.E. 91 at 5.  In other words, it was law-enforcement action (the K-9 deployment and ensuing fracas) that caused the backpack to spill onto the roadway with its contents askew.  This argument is waived because it was not included in the original motion.  Additionally, the cases Young cited in his reply brief and at the hearing do not support this theory.  Further, the fact that the dog kicked the backpack (containing the pistol) out of the vehicle is not new information.  As stated in the first paragraph of the motion to suppress, "As the police dog attacked Young, it kicked several bags out of the car and onto I-75."  D.E. 86 at 1.  This theory, that the K-9 action created the plain-view scenario, could have been raised in the original motion.

Young further argues that the canine itself was a "highly trained" law-enforcement officer that "should be held to the same standard as an actual human police officer."  *Id*.  This argument is also waived.  It could have been raised in the initial motion, and it is not supported by Young's case law.

Young also argues that Trooper Gabriel, the K-9 officer, has a disciplinary history and multiple civil-rights claims against him.  *Id*. at 4.  This argument is also waived.  And it is irrelevant.  Trooper Gabriel was not a witness at the hearing.  Nor did he produce a report that was utilized in opposition to the motion to suppress.

## VIII. CONCLUSION

For the reasons discussed above, the undersigned **RECOMMENDS** that Defendant Young's motion to suppress (D.E. 86) be denied on the merits.  Young's pistol was found in plain view.  Even if not, any search of Young's vehicle and its contents would have been authorized under the automobile exception and as a lawful search incident to arrest.

Further, even if there had been a constitutional violation, there was no flagrant conduct on any officer's part that would justify suppression of the evidence. *See generally Davis v. United States*, 564 U.S. 229 (2011); *Herring v. United States*, 555 U.S. 135 (2009); *Hudson v. Michigan*, 547 U.S. 586 (2006); *United States v. Leon*, 468 U.S. 897 (1984).

The Court issues this Recommended Disposition pursuant to 28 U.S.C. § 636(b)(1)(B). The parties should consult that statute and Federal Rule of Criminal Procedure 59(b) concerning the right to appeal to the District Judge. Any objection must be filed within **fourteen days** of the entry of this order. Any objection must specify the factual findings and legal conclusion being challenged. Failure to object per Rule 59(b) waives a party's right to review. Upon expiration of that fourteen-day period, this matter will be submitted to Judge Boom for her consideration.

This the 28th day of April, 2025.

Signed By:

*Hanly A. Ingram*

United States Magistrate Judge

24