UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action No. 6:24-CR-025-CHB |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| SAMUEL H. YOUNG, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\*    \*\*\*    \*\*\*    \*\*\*

This matter is before the Court on the Recommended Disposition issued by United States Magistrate Judge Hanly A. Ingram, [R. 95], which addresses Defendant Samuel H. Young's Motion to Suppress, [R. 86]. The United States responded to the Motion to Suppress, [R. 87], and Young replied, [R. 91]. The Magistrate Judge conducted a hearing on April 21, 2025. [R. 92]; [R. 100 (Hearing Transcript)]. On April 28, 2025, the Magistrate Judge issued his Recommended Disposition, recommending that the Motion to Suppress be denied. [R. 95]. Young timely filed objections to the Recommended Disposition, [R. 102], and the United States responded to the objections, [R. 105].[1] Therefore, the motion is ripe and ready for review. For the reasons that follow, the Court will adopt the Recommended Disposition as the opinion of this Court, overrule Young's objections, and deny Young's Motion to Suppress.

I.    **BACKGROUND**

---

[1] Young also filed a Motion to Expand the Record, in which he urges the Court to consider photographic evidence that was not presented at the evidentiary hearing on April 21, 2025. [R. 104]. The United States responded to this motion. [R. 105]. The Court first acknowledges that Young's motion is entirely untimely, but even if it were to consider the motion and the attached photographs, it would not change the Court's determination that the search of the vehicle and backpack were justified under the automobile exception, search incident to arrest exception, and the plain view exception.

The Court's discussion of the facts in this case is drawn primarily from the evidentiary hearing held by Magistrate Judge Ingram in this matter. At the hearing, the United States called four law enforcement witnesses: former Kentucky State Police Trooper Michael King, Mount Vernon Police Chief Joe Rush, Kentucky State Police Trooper Dackery Larkey, and Broadhead Police Chief Gary Alcorn. *See* [R. 100, pp. 6:21–7:16]; [R. 94 (Amended Exhibit and Witness List for Evidentiary Hearing)]. Importantly, the testimony from these four witnesses is "uncontradicted." [R. 95, pp. 19–20]; *see also id.* at 19 ("Young did not enter any evidence of his own. The testimony of the government's witnesses thus stands uncontradicted.").

On March 13, 2024, "law enforcement [officers] observed Young following too closely to a semi truck in a vehicle with no license plate and a cracked windshield," so "[t]hey initiated pursuit" to pull over the vehicle.[2] [R. 95, pp. 2, 9]; [R. 100, pp. 15:4–21, 72:16–22, 73:6–15]. Larkey and King engaged in the pursuit, [R. 100, pp. 15:23–17:1, 18:6–8, 73:6–15, 75:4–16], and King pulled up beside the vehicle to see why Young "wasn't stopping." *Id.* at 17:9–10, 75:10–16, 76:11–15. King testified that Young made eye contact with him through the driver's side window, "smirked, and turned and looked back at the road," before King made a gesture and told Young to "pull over." *Id.* at 17:9–22 (internal quotation marks omitted); *see also* 19:2–19, 42:10–24. Young did not pull over. *Id.* at 19:20–25, 75:10–16.

King and Larkey then observed Young "reaching around in the back seat, moving around," and Larkey warned King to "be careful" driving beside Young's vehicle. *Id.* at 20:6–18, 77:5–7; *see also* [R. 94, Pl.'s Ex. 4 (King Dash Camera Footage) (Larkey, at minutes 5:50–6:05, warning King that the driver of the vehicle was reaching into the backseat)]. Larkey also testified that during this point in the pursuit, around mile marker 80, he first "observe[d] [ ] Young pull his hand

---

[2] Both officers identified Young as the person involved in the pursuit. [R. 100, pp. 30:8–11, 91:6–13].

through the sunroof and point" what he believed to be "a firearm, a handgun." [R. 100, p. 76:16–22]; *see also id.* at 77:19–24, 78:25. In response, Larkey "backed off" and "increased [his] distance" from Young's vehicle, *id.* at 76:22–25, as he was "concern[ed]" by seeing a firearm. *Id.* at 77:8–9. A few miles from where Larkey testified that he saw the firearm protruding from the sunroof, Larkey noticed that the driver's side window of the vehicle was rolled down, and Young "stuck his hands out"; then, Larkey saw, "with [his] own eyes, the firearm coming out" of the window and pointed to the side, not forwards or backwards toward Larkey's police cruiser. *Id.* at 79:1–6.

Other members of law enforcement began assisting in the pursuit, *id.* at 21:6–9, 22:25–23:8, 23:19–24:2, 53:9–19, including Rush. *Id.* at 53:4–11. Larkey warned other responding members of law enforcement that he "witnessed a firearm" for their safety. *Id.* at 81:1–4; *see also* [R. 94, Pl.'s Ex. 2 (Larkey Body Camera Footage) (Larkey, at minutes 8:10–8:20 and 20:25–21:00, warning officers about a possible firearm and the driver's hands protruding from the vehicle)]. "[T]here [were] multiple attempts" to deploy "stingers" and "stop sticks" that would deflate Young's tires, [R. 100, p. 21:6–11]; *see also id.* at 21:12–22:14 (explaining the function of "stingers" and "stop sticks"), and, while Rush attempted to deploy his stop sticks, he was unable to safely do so. *Id.* at 54:8–14, 55:2–7, 81:21–25. King and Larkey testified that one set of spike strips was not successfully deployed on Young's tires, Young avoided subsequent sets of deployed stop strips and stingers, and King's "vehicle hit the stop strips." *Id.* at 24:14–22; 79:25–80:4, 80:9–15, 84:3–4.

At this point in the pursuit, which was around mile marker 62, King testified that he observed Young "sticking something out of [his vehicle's] window," and pursuant to King's "training and experience" as a law enforcement officer, he believed that Young stuck "a firearm

out of the middle of the sunroof" of his vehicle. *Id.* at 25:1–9, 26:16–25, 27:6–8. The other officers testified that they also saw what they believed to be a firearm sticking out of the vehicle around this same mile marker. *See id.* at 54:15–17 ("I [saw] the driver stick a hand, [and] what appeared to be a weapon out of the vehicle."); *id.* at 58:13–21; *id.* at 81:13–82:1 (testifying that, around mile marker 63, Larkey saw "another firearm come out of the sunroof"). The sighting of the firearm "concern[ed]" officers, because, as King testified, "not only did it put [his] life in danger, but it also put the motoring public in danger." *Id.* at 27:9–28:4; *see also id.* at 31:23–32:4, 32:18–33:21 (explaining how what King believed was a firearm could be harmful due to the risks of accidental discharge or intentional use against officers); *id.* at 54:19–55:1 (describing how Rush "ducked" under his vehicle "[f]or cover" because he saw "the weapon come up through the sunroof of the vehicle" in the pursuit). King also believed that he saw a firearm sticking out of the sunroof earlier in the pursuit as well but could not remember the exact mile marker. *Id.* at 47:16–48:9. After King noticed what he believed to be the second sighting of a firearm sticking out of the sunroof around mile marker 62, *see id.* at 24:14–25:9, he was "out of the pursuit" because of his tires deflating from the stop strips. *Id.* at 28:5–29:16, 47:16–24, 84:3–6. Rush was no longer involved in the pursuit at this point either. *Id.* at 55:10–14. Larkey stated that he "saw the firearm once more com[ing] out of the sunroof" around mile marker 50, Larkey's fourth sighting of a firearm during the pursuit. *Id.* at 84:11–12.

Kentucky State Police Trooper Glen Reed, another member of law enforcement assisting with the search, successfully deployed spike strips to deflate Young's tires around mile marker 41. *Id.* at 85:9–16. Larkey estimated that there were approximately "10 to 15 patrol vehicles" in pursuit, *id.* at 85:17–19, and responding members of law enforcement were able to "perform a rolling roadblock" to "box[ ] [Young] in." *Id.* at 86:11–14, 20–22.

Once law enforcement officers were able to stop Young's vehicle, "Young refused to exit the vehicle." [R. 95, p. 2]; *see also* [R. 100, pp. 88:7–89:22]. Kentucky State Police Trooper Jack Gabriel gave Young verbal, "loud, explicit instructions to remove himself" from the vehicle. [R. 100, p. 87:23–24]. Law enforcement officers on the scene, including Larkey, were concerned "[m]ainly [with] officer safety," because of the sighting of the firearm during the pursuit and Young's refusal to exit the vehicle. *Id.* at 88:10–14. Officers realized that Young had "barricade[ed] himself" in the vehicle, positioning himself such that "[officers] could not remove him." *Id.* at 88:13–14, 88:19–22, 89:2–6, 89:20–22. Gabriel deployed a police dog to enter the car through the passenger-door window, *id.* at 89:15, 90:18–24, and other officers attempted to remove Young from the vehicle. *Id.* at 89:15–20. Larkey also observed the smell of marijuana coming from the vehicle. *Id.* at 89:23–90:10. While officers tried to remove Young from the vehicle, the police dog "kicked several items out of the vehicle, including a backpack." [R. 95, p. 2]. As stated during the evidentiary hearing, there is "no dispute" on this point:

> THE COURT: Let me make a comment on that. There's no dispute about what we saw on the video, that the dog kicked the backpack out of the vehicle, correct?
>
> THE DEFENDANT: Yes.
>
> THE COURT: There's no dispute that the K-9 was deployed by law enforcement, correct?
>
> THE DEFENDANT: Yes.
>
> THE COURT: You don't dispute either of those facts, do you, [Assistant United States Attorney] Trimble?
>
> MR. TRIMBLE: No, Your Honor.

[R. 100, p. 137:7–16]; *see also* [R. 94, Pl.'s Ex. 3 (Gabriel Body Camera Footage) (demonstrating that, during minutes 31:00–33:30 of the video, the backpack was in the passenger side of Young's

vehicle within his reach, and the police dog kicked the backpack out of the passenger side of the vehicle)].

After Young was removed from the vehicle and "placed in handcuffs," [R. 100, p. 91:14–16], he was "patted [ ] down" but not "identified" until he was transported to the hospital. *Id.* at 92:5–7, 111:18–20. During this time, members of law enforcement began collecting evidence. *See id.* at 91:18–19, 92:8–94:17. Broadhead Police Chief Gary Alcorn, one of the law enforcement officers on scene, "reported that he saw the butt of a pistol protruding from Young's backpack while it lay on the ground." [R. 95, p. 2]; *see also* [R. 100, pp. 116:20–117:17, 123:7–8, 127:24–128:11, 132:18–22]. Alcorn, who was stationed at the passenger side door of Young's vehicle, reached for the pistol to make sure that it was not loaded and was safe for other officers to collect as evidence before placing it on the passenger seat of the vehicle. [R. 100, pp. 116:13–118:10, 118:14–16]. Alcorn then searched the backpack and a "heavy jacket" found next to the backpack, as well as the passenger seat and floorboard area. *Id.* at 125:23–126:25. Larkey did not collect evidence but took pictures of the evidence once "other officers placed the evidence on an automobile hood," [R. 95, p. 13]; [R. 100, pp. 91:23–92:3]; this evidence included "a handgun, some ammunition, a temporary paper license plate," "[k]ey fob, two ID cards, and a baggie of suspected marijuana and some digital scales." [R. 100, pp. 92:25–93:3]. The ammunition was found in the vehicle. *Id.* at 93:19–94:2.

Meanwhile, other officers transported Young to a nearby hospital. *See id.* at 29:16–22, 111:18–20. King was one of the officers at the hospital, and he testified that Young was acting "belligerent[ly]" with the hospital staff, *id.* at 29:19–20, and that Young refused to accept medical treatment. *Id.* at 29:23–30:3; *see also id.* at 43:25–44:2. When Young was released from the

hospital, King noted that Young "wouldn't cooperate in getting inside the [police] vehicle." *Id.* at 29:21–22, 43:25–44:29.

Young was ultimately charged with "(1) license plate not legible; (2) obstructed vision and/or windshield; (3) fleeing or evading the police, first degree; (4) wanton endangerment, first degree; (5) wanton endangerment, second degree-police officer; (6) possession of marijuana; (7) possession of a handgun by a convicted felon; (8) criminal mischief; and (9) resisting arrest," all under state law. [R. 95, pp. 2–3].

On April 25, 2024, a federal grand jury indicted Young for a single violation of 18 U.S.C. § 922(g)(1). [R. 1]. In particular, the Indictment charged Young, who "had previously been convicted of a crime punishable by imprisonment for a term exceeding one year," with "knowingly possess[ing] a firearm, that is, a SCCY, CPX-2, 9 mm pistol with serial number 259174," which "was in and affecting commerce, all in violation of 18 U.S.C. § 922(g)(1)." *Id.* at 1. Upon the issuance of the federal Indictment, Young's state law charges were dismissed. [R. 86-1, p. 3].

The procedural history of this case has been detailed by the Court in a previous order, *see* [R. 81]. Therefore, the Court only recites the procedural history pertaining to the pending Motion to Suppress, [R. 86].

On March 21, 2025, Young's Motion to Suppress was filed into the record. *Id.* As the Magistrate Judge stated, "[t]he motion is obviously a typewritten motion previously prepared by [Young's previous attorney,] Mr. [Travis] Rossman." [R. 95, p. 4]. In the motion, Young argues that the search of his vehicle and seizure of both the firearm and ammunition violated his Fourth Amendment rights. *See generally* [R. 86]; [R. 86-1]. In particular, Young contends that the search and seizure did not fall under the plain view exception, automobile exception, search incident to arrest, or any "other valid Fourth Amendment basis." *See generally* [R. 86-1]. Young asks that the

Court "suppress all evidence relating to the firearm, ammunition, and derivative evidence from the unconstitutional searches and seizures of [his] vehicle and backpack." *Id.* at 8. The United States responded, [R. 87], and Young replied, [R. 91]. This matter was referred to Judge Ingram to prepare a report and recommendation. [R. 88]. Having considered the full record and holding an evidentiary hearing, Magistrate Judge Ingram issued a Recommended Disposition, recommending that the Motion to Suppress be denied, [R. 95]. Young timely filed objections to the Recommended Disposition, [R. 102], and the United States filed a response, [R. 105]. The Court now addresses the motion.

## II.    LEGAL STANDARD

Under 28 U.S.C. § 636(b)(1)(A), a district court judge may designate a Magistrate Judge to conduct evidentiary hearings and submit proposed findings of fact and recommendations for the disposition of certain motions, including motions to suppress evidence. Within fourteen days of being served a copy of that recommended disposition, any party may file written objections to the Magistrate Judge's proposed findings and recommendation. 28 U.S.C. § 636(b)(1). This Court must then "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.*; *see also Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). A specific objection, which preserves the issue for appeal, "explain[s] and cite[s] specific portions of the report which [counsel] deem[s] problematic." *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 1997) (alterations in original) (internal quotation marks omitted) (quoting *Smith v. Chater*, 121 F.3d 709 (Table), 1997 WL 415309, at *2 (6th Cir. 1997)). Courts need not conduct de novo review of general objections that fail to identify specific factual or legal issues, because it duplicates the Magistrate Judge's efforts and wastes judicial economy. *Howard v. Sec. of Health & Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Ultimately, a district court

may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).[3]

## III.    ANALYSIS

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . . ." U.S. Const. amend. IV. "The basic purpose of this Amendment, as recognized in countless decisions of the Supreme Court, is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *United States v. Loines*, 56 F.4th 1099, 1105 (6th Cir. 2023) (cleaned up). Thus, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Id.* (cleaned up). "The government bears the burden of demonstrating that an exception to the warrant requirement applies." *Id.* (citations omitted).

In the Recommended Disposition, Judge Ingram concluded that, "by a preponderance of the evidence, [ ] the government has met its burden of justifying the seizure of the" firearm under the plain view doctrine, automobile exception, and as a search incident to arrest, so Young's Motion to Suppress "should be denied on the merits." *See* [R. 95, pp. 1–2]. Young objects to Judge Ingram's findings that these doctrines justify the search and seizure of the firearm, ammunition, and other evidence obtained during the search. *See generally* [R. 102].

---

[3] Throughout his objections, Young argues that, "[a]t [the] summary judgment stage," the Court "must view the facts in the light [depicted] by the videotapes." [R. 102, p. 5]; *see id.* at 5–7. While the Court will address Young's arguments concerning the credibility of the testifying witnesses and video footage below, it is worth noting that Young misunderstands the stage of this litigation. There have been no motions for summary judgment filed in this case, nor are summary judgment motions cognizable in criminal cases, so there is no reason for the Court to utilize that standard. *See, e.g.*, *United States v. Neill*, No. 2:21-CR-00004, 2021 WL 3912796, at *2 (M.D. Tenn. Sept. 1, 2021) ("[T]he Federal Rules of Criminal Procedure simply do not prescribe any such kind of summary-judgment process."). Additionally, for purposes of the instant motion, Young *is* the movant, so he would not be entitled to any deference as the non-moving party.

As the Magistrate Judge noted, Young challenges the search of his vehicle and seizure of the firearm and ammunition, not the stop of his vehicle. [R. 95, p. 5]. Therefore, the Court must consider whether the search of his vehicle and seizure of the firearm and ammunition present constitutional concerns. The Court will now address Young's three challenges to the justifications for the search and seizure: (1) the automobile exception, (2) the search incident to arrest exception, and (3) the plain view doctrine. *See* [R. 102].

### A.    Automobile Exception

First, the Court considers Young's objection to the Magistrate Judge's finding that the automobile exception justified the search of his vehicle and backpack. *See* [R. 102, p. 10]; [R. 95, pp. 15–19]. Recall that "the Fourth Amendment imposes a 'per se requirement' that police officers obtain a warrant prior to conducting a search." *United States v. Ferguson*, No. 22-2151, 2024 WL 1093723, at *8 (6th Cir. Mar. 13, 2024) (citations omitted). "The automobile exception, however, allows officers to search a vehicle without a warrant if they have 'probable cause to believe that the vehicle contains evidence of a crime.'" *Id.* (quoting *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007)). "A police officer has probable cause to conduct a search when the facts available to the officer would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." *Id.* (cleaned up). And, "[p]robable cause to search a vehicle is defined as reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion." *United States v. Lyons*, 687 F.3d 754, 764 (6th Cir. 2012) (internal quotation marks and citation omitted); *see also* [R. 95, p. 16 (quoting *United States v. Graham*, 275 F.3d 490, 509 (6th Cir. 2001))]. Importantly, "[p]robable cause deals with probabilities and depends on the totality of the circumstances," and "[s]ubjective intentions play no role in ordinary, probable cause Fourth Amendment analysis." *Ferguson*, 2024 WL 1093723, at *8 (cleaned up).

- 10 -

As a threshold matter, the Court must address the criminal activity at issue here. Young repeatedly and mistakenly argues throughout his motion and objections concerning the various doctrines that it was being a felon in possession, and officers lacked knowledge of his felon status at the time of the pursuit. *See* [R. 86-1, p. 4]; *see generally* [R. 102]. However, the record makes clear that the suspected criminal activity that officers were investigating during the pursuit and subsequent stop of Young's vehicle was wanton endangerment. [4]

Magistrate Judge Ingram concluded that the officers had probable cause to search Young's vehicle pursuant to their "reasonable belief that Young had brandished a weapon while driving, thereby committing first-degree wanton endangerment" based on the following facts:

> [T]hree officers testified they felt certain they saw Young stick his hand out of his vehicle while holding a pistol. Perhaps most compellingly, all three officers testified to seeing the gun around miles 62 to 59. Chief Rush was at exit 62 attempting to throw his "stop strips" when he saw the driver stick his hand out the window with a gun. In response, Rush took "cover" behind his own vehicle to avoid being shot. Trooper Larkey testified he saw Young holding the firearm around the time he passed Chief Rush. And Officer King also testified he saw Young holding a firearm earlier than the part of the video where two empty hands can be seen (which was near mile 59, a couple miles south of Chief Rush's location). All three officers, separated during each other's testimony, testified they were certain at the time that they had seen a handgun. Trooper Larkey explained in his report and testimony that he believed Young stuck a gun out of the car at least four times. The beliefs of these multiple eyewitnesses amount to more than a hunch. A reasonable person in their position could easily conclude Young's vehicle had a fair probability of containing evidence of wanton endangerment, i.e., the handgun which had been brandished.

[R. 95, p. 18]; *see also id.* (clarifying that "the Court does not need to find that Young *actually* waved a gun out his window and sunroof during the chase," and recognizing "that Young's pistol,

---

[4] "A person is guilty of wanton endangerment in the first degree when, under circumstances manifesting extreme indifference to the value of human life, he or she wantonly engages in conduct which creates a substantial danger of death or serious physical injury to another person." Ky. Rev. Stat. § 508.060(1). As the Magistrate Judge detailed, brandishing a firearm is an example of conduct sufficient to constitute wanton endangerment in the first degree. [R. 95, pp. 17–18].

when discovered, was unloaded," but stating that "[t]he question, however, is whether officers had reasonable grounds for believing Young had brandished a firearm, supported by less than prima facie proof but more than mere suspicion.").

After review of the entire record, the Court agrees with the Magistrate Judge's finding that the search of Young's vehicle was supported by probable cause. To reiterate, "[p]robable cause deals with probabilities and depends on the totality of the circumstances," *Ferguson*, 2024 WL 1093723, at *8 (cleaned up), and in this instance, it is clear that officers had probable cause to search Young's vehicle. King, Rush, and Larkey all testified independently that they witnessed Young sticking a firearm out of the sunroof of his vehicle. *See* [R. 100, pp. 25:1–9, 26:16–22, 27:6–8, 47:16–25, 48:2–9, 54:9–17, 58:13–21, 76:16–22, 77:19–21, 78:25, 79:1–6, 81:23–82:1, 84:11–12]. Notably, Larkey testified that he saw the driver of the vehicle stick a firearm out of the vehicle on four separate occasions, and he warned other officers about the firearm over the radio during the pursuit. *Id.* at 76:16–22, 77:19–21, 78:25, 79:1–6, 81:13–82:1, 81:1–4. In addition, Alcorn testified that, during the pursuit, he "heard on the radio there was a pursuit coming into Rockcastle County, and then the radio traffic had stated [someone was] brandishing a firearm." *Id.* at 115:1–7. These reported sightings of the firearm during the pursuit were sufficient to give all of the officers "reasonable grounds for belief"—and much more than "mere suspicion"—that the driver of the vehicle was wantonly endangering the public and members of law enforcement during the pursuit by sticking the firearm out of the vehicle. *See Lyons*, 687 F.3d at 764. Again, as the Magistrate Judge clearly stated, "the Court does not need to find that Young *actually* waved a gun out his window and sunroof during the chase," only that "officers had reasonable grounds for believing Young had brandished a firearm, supported by less than prima facie proof but more than

mere suspicion," in order to find probable cause for the search. [R. 95, p. 18]. Given all this information, the officers had probable cause to believe the vehicle contained evidence of a crime.

Young expends great effort to convince the Court that the Motion to Suppress should be granted because there is no evidence of him waving a firearm visible on any body camera or dash camera footage introduced by the United States at the evidentiary hearing. *See generally* [R. 100]; [R. 102]. The Court construes this argument as generally calling into question the finding of probable cause, which has already been addressed, and specifically challenging King, Larkey, and Rush's testimony about seeing the firearm during their pursuit of Young, along with Alcorn's testimony about seeing the firearm in the backpack after the pursuit. In many regards, the Court views this objection as challenging the officers' credibility as witnesses. This argument, however, is unconvincing. In *United States v. Hunter*, No. 24-1471, 2025 WL 619590 (6th Cir. Feb. 26, 2025), the Sixth Circuit considered a similar argument from a defendant about the weight of officer testimony concerning probable cause when video evidence did not clearly show the violation supporting probable cause. *See generally id.* In that case, the defendant argued that the officers did not have probable cause to stop him because they could not have observed him running a stop sign, and that video evidence did not record this conduct either. *Id.* at *2. The Sixth Circuit gave great weight to the district court's conclusion that the officers were credible and had probable cause. *Id.* at *2–3. The video evidence was "fragmentary" and "inconclusive," as it did not show whether the defendant had run the stop light—while it did not definitively prove the officers' testimony, it "[did] not contradict the troopers' version of events" either. *Id.* at *2. Even so, the Sixth Circuit upheld the district court's determination that the officers could have seen more than the video evidence demonstrated, as it was a "stationary" camera, and that the testimony was credible and consistent with the evidence. *Id.* at *2–3.

- 13 -

Similar to *Hunter*, the testifying officers in this case were highly credible, and their testimony was uncontradicted, as the Magistrate Judge determined. [R. 95, pp. 9, 19–21]. Given Magistrate Judge Ingram's credibility determinations, and upon review by this Court of the entire hearing transcript and evidence, this Court likewise finds that King, Larkey, and Rush credibly testified as to if and when they saw the firearm and why what they saw caused them to have reasonable suspicion that Young had brandished a firearm outside of his vehicle's sunroof and driver's side window, thereby wantonly endangering others. *See United States v. Garrido*, 467 F.3d 971, 978–79 (6th Cir. 2006) (discussing deference afforded to district court's determination on credibility); *cf. United States v. Hill*, 195 F.3d 258, 273 (6th Cir. 1999) ("We are not persuaded otherwise by Defendants' attack on Deputy Whitlock's credibility, where the district court credited Deputy Whitlock as being a credible witness and where nothing in the record supports Defendants' contention to the contrary."). King, Larkey, and Rush all independently testified to seeing the firearm protruding from the sunroof around mile marker 62, [R. 100, pp. 24:14–25:9, 26:16–25, 27:6–8, 47:16–48:3, 54:9–17, 58:13–21, 81:13–82:1], and King and Larkey's dash and body camera footage confirms that there were warnings over the radio about a firearm protruding from the vehicle during the pursuit. [R. 94, Pl.'s Ex. 2 (Larkey, at minutes 8:10–8:20 and 20:25–21:00, warning officers about a possible firearm and the driver's hands protruding from the vehicle)]; [R. 94, Pl.'s Ex. 4 (confirming that, during minutes 15:00–15:32, 16:15–16:30, and 17:36–17:50, officers were warned over the radio about the firearm sightings)]. Further, as Judge Ingram mentioned, the officer's honesty and candor regarding their not seeing the firearm in the video evidence at the hearing "bolsters," rather than weakens, their credibility. *See* [R. 95, p. 19]; *see also* [R. 100, pp. 40:16–20, 60:11–13, 95:11–16]. Finally, the Court notes that the officers clearly explained how body camera and dash camera footage does not always show things clearly, as it

- 14 -

can produce footage that "is grainy [and] not high resolution." *See, e.g.*, [R. 100, p. 74:2–12]. Therefore, as Larkey testified, officers "can see much better" with their own eyes than "through [ ] dash cam footage" because, "using [an officer's] own perspective and [ ] vision," an officer "can see things much more clearly." *Id.* at 74:5–9. While Young did not clearly argue about Alcorn's discovery of the firearm lacking video footage evidence, the Court finds that he credibly testified as to how he observed part of the firearm protruding from the backpack, immediately recognized it to be a firearm, and took steps to safely collect the gun as evidence of Young's crimes. *Id*. at 117:1–24.

Importantly, this case presents a wrinkle to the traditional automobile exception, since the backpack containing the firearm was, undisputedly, "kicked out" of Young's vehicle by the police dog while trying to force Young to exit the vehicle. [R. 95, pp. 2, 21, 23]; [R. 100, p. 137:7–16 (confirming, during the evidentiary hearing, neither party disputes that the police dog kicked the backpack out of the vehicle)]. Young argues that, "[w]hile there was no question that the backpack came from the vehicle, its removal undermines the justification for the automobile exception based on exigency and diminished privacy." [R. 86-1, p. 6]. Despite this admission and the undisputed video evidence showing the backpack in the vehicle when Young was stopped by officers, he argues in his objections that there is "no evidence the alleged weapon came from Young[']s vehicle." [R. 102, p. 11]. This assertion flatly misstates the record. At the time of the stop of Young's vehicle, the backpack was clearly inside of the vehicle and, plainly, would have been lawfully searched under the automobile exception. *See* [R. 94, Pl's. Ex. 3 (showing, between minutes 31:00–33:30, the backpack in the passenger side of Young's vehicle and on the ground after it was kicked out of the vehicle by the police dog); *see also United States v. Clayton*, No. 22-CR-20262-JTF-TMP, 2024 WL 2179142, at *3 (W.D. Tenn. Mar. 15, 2024), *report and*

- 15 -

*recommendation adopted*, 2024 WL 2163002 (W.D. Tenn. May 14, 2024), and *report and recommendation adopted*, 2025 WL 943090 (W.D. Tenn. Mar. 28, 2025) ("If law enforcement has probable cause to search a vehicle under the automobile exception, this probable cause extends to all containers in the vehicle that 'might contain the object of the search.'" (quoting *United States v. Ross*, 456 U.S. 798, 821–22 (1982))). As Alcorn credibly testified, he saw the firearm protruding from the backpack after it was kicked to the roadside. [R. 100, p. 117:1–17]. The backpack only ended up outside of the vehicle after the stop because Young refused to obey officer commands to exit the vehicle, which resulted in the police dog being deployed. [R. 94, Pl's. Ex. 3]; *see also* [R. 100, pp. 87:23–90:24]. It was Young's refusal to obey officer commands to exit the vehicle— not officer misconduct or overreach—that caused the backpack to ultimately land outside of the passenger side of the vehicle after the stop. *See* [R. 94, Pl's. Ex. 3]; [R. 100, pp. 87:23–90:24]. The automobile exception applies under these facts, and Young's noncompliance, which dislodged the backpack from the vehicle, does not render the exception inapplicable.

Contrary to Young's argument, the Court also finds that the purpose of the automobile exception supports the search of the backpack. "The Supreme Court has identified two rationales for this exception: the 'ready mobility' of vehicles and the 'lesser expectation of privacy' in them due to the 'pervasive regulation of vehicles capable of traveling on the public highways.'" *United States v. McElrath*, No. 5:22-CR-32-BJB, 2023 WL 8681193, at *2 (W.D. Ky. Dec. 15, 2023) (quoting *California v. Carney*, 471 U.S. 386, 390–92 (1985)); *see also United States v. Galaviz*, 645 F.3d 347, 355 (6th Cir. 2011); *United States v. Whipple*, 92 F.4th 605, 613 (6th Cir. 2024). Again, "the automobile exception [ ] allows officers to search a vehicle [when there is] 'probable cause to believe that the vehicle contains evidence of a crime.'" *Ferguson*, 2024 WL 1093723, at *8 (quoting *Smith*, 510 F.3d at 647). Moreover, "[i]f law enforcement has probable cause to search

a vehicle under the automobile exception, this probable cause extends to all containers in the vehicle that 'might contain the object of the search.'" *Clayton*, 2024 WL 2179142, at *3 (quoting *Ross*, 456 U.S. at 821–22).

As outlined above, in the instant case, the unzipped backpack was *inside* the vehicle when it was stopped, and it was only removed from the vehicle by the police dog when trying to extract Young from the vehicle. In this way, the backpack retained "the same potential mobility as [ ] the car," and had a lesser expectation of privacy, as it would have moved with the car had Young tried to flee with the vehicle before the police dog was deployed. *See id.* As explained above, the officers had probable cause to search the vehicle, and consistent with the location of the backpack when the vehicle was stopped, the officers had probable cause to search the backpack.[5] Therefore, Young's objection on this point is overruled.

## B.    Search Incident to Arrest

Next, the Court turns to whether the search is justified as a search incident to arrest. "As a general matter, a search-incident-to-arrest allows officers to search those areas within the arrestee's immediate control, understood to mean the area from within which [the arrestee] might gain possession of a weapon or destructible evidence." *United States v. Mincy*, No. 1:20-CR-61, 2022 WL 17176398, at *4 (S.D. Ohio Nov. 23, 2022) (internal quotation marks omitted) (alteration in original) (quoting *Arizona v. Gant*, 556 U.S. 332, 335 (2009)). "Under this exception, as relevant here, [p]olice may conduct a search of a vehicle incident to a lawful arrest [of its occupant] when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *United States v. Williams*, No. 22-1365, 2023 WL 3815097, at *3 (6th Cir. June 5, 2023) (alteration in original) (quoting *United States v. Alexander*, 954 F.3d 910, 917 (6th Cir. 2020)

---

[5] The ammunition found within the vehicle falls within the automobile exception as well, since officers clearly had probable cause to search the vehicle for evidence of wanton endangerment, as explained above.

(cleaned up)); *see also McElrath*, 2023 WL 8681193, at *4 ("Police may search a vehicle incident to a recent occupant's arrest . . . if . . . it is reasonable to believe the vehicle contains evidence of the offense of arrest." (quoting *Gant*, 556 U.S. at 351)).

Young urges this Court to take a narrow view of the search incident to arrest exception. In his original Motion to Suppress, his arguments are two-fold: First, he argues that "[a]uthorities did not have reason to believe that evidence of any crime would be found in the vehicle" because (1) the exterior vehicle violations (the cracked windshield and missing license plate) "were readily apparent" from the exterior; (2) "[t]he other charged offenses are similarly complete"; and (3) "for the firearm and marijuana charges, there was no reasonable basis to believe that [he] had committed them at the time of the search." [6] [R. 86-1, p. 7]. Second, Young cites to *Arizona v. Gant*, 556 U.S. 332, 343 (2009), in arguing that the search was unlawful because searches incident to arrest are permissible "when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search," and neither was true here. *Id.* In his objections, Young recites his *Gant* argument (although he relies on a different case), and he claims that the search incident to arrest exception, which has "temporal and geographic limitation[s]," does not apply since the "firearm was retrieved from somewhere outside of [his] vehicle[,] possibly someone else[']s car." [R. 102, p. 11].

These arguments are unavailing. As the Magistrate Judge noted, one of Young's arguments does not apply because it is clear from the evidence that "Young was not unsecured at the time of the search." [R. 95, p. 20 n.1]. Therefore, as the Magistrate Judge explained, the Court focuses on the standard for a search of a vehicle under the search incident to arrest exception: "(1) the arrest must have been lawful (i.e., supported by probable cause and not otherwise unlawful), and (2) it

---

[6] As mentioned above, Young mistakenly focuses his argument on the wrong crimes and fails to consider that the officers were investigating the crime of wanton endangerment.

must have been reasonable for the police to believe that evidence of the defendant's crime of arrest[, wanton endangerment,] would be found in his vehicle." [R. 95, p. 20 (citing *Williams*, 2023 WL 3815097, at \*3 (alteration in original) (quoting *Alexander*, 954 F.3d at 917 (cleaned up))]. And again, in the vehicle context, the arrestee must have been an occupant of the vehicle to be searched. *See McElrath*, 2023 WL 8681193, at \*4 ("Police may search a vehicle incident to *a recent occupant's arrest* . . . if . . . it is reasonable to believe the vehicle contains evidence of the offense of arrest." (emphasis added) (quoting *Gant*, 556 U.S. at 351)).

Nowhere does Young dispute that his arrest was lawful, and in any event, the Court has already found that the officers had probable cause for the charged conduct of wanton endangerment. Accordingly, the Court need only evaluate whether it was reasonable for the officers to believe that evidence of the defendant's crime of arrest would be found in his vehicle or in the backpack, located in the passenger side of the vehicle (and within Young's reach) at the time of the stop.

Similar to the analysis above, it is clear from the record evidence that the officers did have a reasonable belief that there was evidence related to Young's brandishing a firearm and wanton endangerment in the vehicle and in the backpack located directly beside Young at the time of the stop. *See supra* Section III.A. ("King, Rush, and Larkey all testified independently that they witnessed Young sticking a firearm out of the sunroof of his vehicle. *See* [R. 100, pp. 25:1–9, 26:16–22, 27:6–8, 47:16–25, 48:2–9, 54:9–17, 58:13–21, 76:16–22, 77:19–21, 78:25, 79:1–6, 81:23–82:1, 84:11–12]. Notably, Larkey testified that he saw the driver of the vehicle stick a firearm out of the vehicle on four separate occasions, and he warned other officers about the firearm over the radio during the pursuit. *Id.* at 76:16–22, 77:19–21, 78:25, 79:1–6, 81:13–82:1, 81:1–4. In addition, Alcorn testified that, during the pursuit, he 'heard on the radio there was a

pursuit coming into Rockcastle County, and then the radio traffic had stated [someone was] brandishing a firearm.' *Id.* at 115:1–7."). Accordingly, it was "reasonable [for the officers] to believe evidence relevant to the crime of arrest might be found in the vehicle." *Williams*, 2023 WL 3815097, at *3 (quoting *Alexander*, 954 F.3d at 917 (cleaned up)).

Young argues that the search was limited to areas within his immediate control, and since the backpack, at the time it was searched, was not in the vehicle, it could not fall under the search incident to arrest exception. [R. 102, p. 11 ("It is well established that searches inc[i]dent to arrest [h]ave both geographic and temporal limitation[s].")].[7] However, the search incident to arrest exception in the vehicle context *also* allows officers to search the passenger compartment and containers therein if it is "reasonable [for the officers] to believe evidence relevant to the crime of arrest might be found in the vehicle." *Williams*, 2023 WL 3815097, at *3 (quoting *Alexander*, 954 F.3d at 917 (cleaned up)); *see Gant*, 556 U.S. 332 (holding that "[p]olice may search the passenger compartment of a vehicle incident to a recent occupant's arrest only if it is reasonable to believe that the arrestee might access the vehicle at the time of the search or that the vehicle contains evidence of the offense of arrest"); *see also United States v. Vining*, 675 F. Supp. 3d 778, 796 (E.D. Mich. 2023), *appeal dismissed*, No. 23-1606, 2023 WL 9057497 (6th Cir. Aug. 14, 2023) ("[R]egardless of whether the arrestee is within reaching distance, a warrantless search of the passenger compartment is permissible if a passenger is arrested and the officers have reasonable

---

[7] While the Court addresses Young's argument that the backpack was outside of the vehicle, and therefore not subject to the search incident to arrest exception, it will not credit Young's unsupported claim that the firearm was found in another person's vehicle. [R. 102, p. 11]. Judge Ingram provided the opportunity for both parties to present evidence on the search and seizure of the firearm, and only the United States presented evidence. *Matthews*, 422 F. Supp. 3d at 1243 n.3 (explaining that the Court held the officer's testimony to be "unrebutted" where the defendant "did not take the stand [ ] and did not provide any testimony or other evidence to rebut [the officer's] testimony"). The evidence presented in the evidentiary hearing clearly demonstrated that the backpack was inside Young's vehicle at the time he was stopped. *See* [R. 94, Pl.'s Ex. 3]. Moreover, Alcorn testified that he found the open backpack on the ground, next to the passenger side door of Young's vehicle, with the butt of the gun protruding from it. [R. 100, p. 116:13–117:17].

suspicion that 'the vehicle contains evidence of the offense of arrest.'" (quoting *Gant*, 556 U.S. at 351)).

Here, the backpack falls under the search incident to arrest exception, for much the same reason as the automobile exception. The video evidence clearly shows that the backpack was in the passenger side of the vehicle at the time of the stop and Young's arrest. [R. 94, Pl's. Ex. 3 (showing, at minutes 31:00–33:30, the backpack in the passenger side of Young's vehicle). It inadvertently landed outside of the passenger side of the vehicle because of Young's failure to obey officer commands to exit the vehicle. *Id.* In response to his refusal to obey these commands, officers deployed a police dog to assist in extracting Young from the vehicle. *Id.*; *see also* [R. 100, pp. 87:23–90:24]. As shown in the video evidence, while trying to remove Young from the vehicle, the police dog kicked the backpack and other contents of the vehicle out of the vehicle and onto the ground next to the passenger side of the vehicle. [R. 94, Pl's. Ex. 3 (showing, at minutes 31:00–33:30, the backpack in the passenger side of Young's vehicle, and the police dog kicking the backpack out of the passenger side of the vehicle). Young's argument that his noncompliance, which resulted in the deployment of the police dog and inadvertent dislodging of the backpack, should disqualify the backpack from the search incident to arrest exception is unavailing under the particular facts of the case.[8] Therefore, Young's objection is overruled.

### C.    Plain View Doctrine

"The plain-view doctrine permits certain warrantless *seizures*, not searches." *United States v. Lewis*, 81 F.4th 640, 654 (6th Cir. 2023) (emphasis in original).

Under the plain view doctrine, four factors must be satisfied: (1) the item seized must be in plain view, (2) the item's incriminating character must be immediately

---

[8] The ammunition found within the vehicle clearly fits within the search incident to arrest exception for the reasons stated in this section. Officers had a reasonable belief that the vehicle contained evidence related to the crime of wanton endangerment.

apparent, (3) the officer must lawfully be in the place from where the item can be plainly seen, and (4) the officer must have a lawful right of access to the item.

*Loines*, 56 F.4th at 1106 (internal quotation marks and citation omitted); *see also Lewis*, 81 F.4th at 653 ("Under the plain-view doctrine, if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." (cleaned up)); *United States v. Taylor*, 248 F.3d 506, 512 (6th Cir. 2001) ("The plain view exception to the warrant requirement applies when (1) the officer did not violate the Fourth Amendment in arriving at the place where the evidence could be plainly viewed, (2) the item is in plain view, and (3) the incriminating character of the evidence is immediately apparent.").

Young's Motion to Suppress and Objections focus mainly on the second prong—whether the incriminating character of the firearm was "immediately apparent." *See* [R. 86-1, p. 4]; [R. 102, pp. 7–9]. He argues that "the incriminating nature of the firearm was not immediately apparent" because the officers were not aware that he was a convicted felon at the time of the search and seizure. [R. 86-1, p. 4].[9] In response, the United States contends that it did not matter whether the officers knew of Young's criminal history, as his "brandishing of a firearm during flight" is enough to demonstrate that "the incriminating character of the firearm under these circumstances [was] immediately apparent." [R. 87, p. 15]. The Magistrate Judge agreed with the United States, finding that Alcorn's testimony that he "heard over police radio that the driver was brandishing a handgun, which is indicative of wanton endangerment," makes the firearm's "incriminating nature [ ] immediately apparent." [R. 95, p. 21]. In his objections, Young reiterates his argument concerning the officers' lack of knowledge about his felon status, and he also asserts that Alcorn provided two

---

[9] Again, Young focuses on the wrong crime and fails to consider that the officers were investigating the crime of wanton endangerment.

accounts of his involvement in the pursuit and knew too much, or on the other hand, too little about the potential brandishing of a firearm to conduct a warrantless search under the plain view exception.[10] *See* [R. 102, pp. 7–9].

Before considering whether the incriminating character of the firearm was immediately apparent, the other three factors are easily disposed of and will be discussed in turn. First, it is clear that the firearm was in plain view. While Young "denies that the butt of the gun was sticking out of the backpack," and that the backpack was unzipped, [R. 86-1, p. 4], he has put forward no evidence to support that argument. *See United States v. Matthews*, 422 F. Supp. 3d 1235, 1243 n.3 (W.D. Ky. 2019) (explaining that the Court held the officer's testimony to be "unrebutted" where the defendant "did not take the stand [ ] and did not provide any testimony or other evidence to rebut [the officer's] testimony beyond the self-serving statements on the bodycam footage"). The

_____

[10] The best the Court can tell, Young ultimately argues that Alcorn is not being truthful. *See* [R. 102, pp. 7–9]. On one hand, Young asserts, Alcorn stated that he assisted in the pursuit and had knowledge that the driver involved in the pursuit had brandished a firearm. *Id.* at 7–8. He contends that, under *Commonwealth v. Perry*, 798 A.2d 697 (Pa. 2002), "if the police have prior information" or "advance knowledge" that "a parked car may contain a criminal item," they cannot simply approach the car" using the plain view exception—they must have a warrant. *Id.* at 8. It follows from Young's argument that he believes Alcorn needed a warrant to search the backpack because Alcorn had knowledge of the brandishing of a firearm before he saw the backpack. *See id.* On the other hand, Young continues, Alcorn stated that he did not actively assist in the pursuit and only heard radio traffic about the pursuit before he stopped to assist officers when Young's tires were deflated. *Id.* at 7–8. Young claims that Alcorn knew "nothing about the scene" before "search[ing] for plain view items." *Id.* at 9. Under *State v. Mesley*, 732 N.E.2d 477 (Ohio App. 6th Dist. 1999), Young argues, Alcorn needed more than a hunch—he needed reasonable and articulable suspicion. [R. 102, pp. 8–9]. Because he had only heard radio reporting from officers involved in the pursuit, he did not personally know enough to have more than a hunch about brandishing a firearm; in this way, he could not invoke the plain view exception. *Id.*

There are many issues with this argument. First, the non-binding cases on which Young relies are not persuasive and easily distinguishable because they do not stand for the propositions that Young claims they do. In *Perry*, a Pennsylvania state court decision, the state supreme court addressed whether the facts at hand warranted an exigent circumstance sufficient for officers to search the vehicle under the *automobile exception*—there was no discussion of plain view. *See generally* 798 A.2d 697. And in *Mesley*, an Ohio state court case, the court of appeals also dealt with the automobile exception. *See generally* 732 N.E.2d 477. In that case, the court determined that the officers did not have reasonable suspicion to stop a vehicle, which included a passenger with narcotics in his lap. *Id.* The court's discussion of plain view was addressed only as a collateral concern: since the officers did not have reasonable suspicion to stop the vehicle, it negated their lawful access to the narcotics inside the vehicle, which they alleged were in plain view. *Id.* Second, as already addressed above, it is clear that the officers had reasonable suspicion that Young had brandished a firearm to justify a search under the automobile exception and as a search incident to arrest. *See supra* Section III.A.–B. Finally, to the extent that this argument challenges Alcorn's credibility, that has also been addressed by the Court. *See supra* Section III.A.

United States, meanwhile, produced witness testimony from Alcorn about how he observed the butt of the firearm in the unzipped backpack on the ground outside of the vehicle and what he did in response to this observation. [R. 100, pp. 116:20–117:17, 123:7–8, 127:24–128:11, 132:18–23]; *see also* [R. 94, Pl's. Ex. 3 (demonstrating that, during minutes 31:00–33:30 of the video, the backpack was in the passenger side of Young's vehicle within his reach, and the police dog kicked the unzipped backpack out of the passenger side of the vehicle)]. This particular body camera footage clearly shows that the backpack was unzipped while it was in the vehicle and as it was dislodged from the vehicle. *See* [R. 94, Pl's. Ex. 3]. The footage does not show the backpack on the ground once it was dislodged from the vehicle. *See id.*

Second, Alcorn was lawfully in the place from where he saw the firearm, which was outside of a vehicle on the shoulder of a major interstate at the end of a lengthy vehicle pursuit. *Cf. United States v. Brooks*, No. 21-20369, 2022 WL 19186, at *5 (E.D. Mich. Jan. 3, 2022) ("First, recall that when the officers approached the Kia, [the defendant] exited the car and left the driver's door open. [The officer] was thus in a lawful position outside this open door."). As the United States points out, the interstate shoulder is "hardly a private location" where Young would have had any authority to keep officers away. [R. 87, p. 14]. Moreover, it is undisputed by the parties that Alcorn was at the scene to assist with a lawful stop of Young's vehicle. Third, for much the same reason, Alcorn had a lawful right of access to the item. Although Young contends that Alcorn needed "a search warrant or probable cause to believe that contraband was in the backpack," [R. 86-1, p. 4], Alcorn clearly had a lawful right of access to the firearm because it was in plain view on a public roadside, a position where Alcorn was already located when he observed the firearm. *See Boone v. Spurgess*, 385 F.3d 923, 928 (6th Cir. 2004) (explaining that the purpose of this factor is "to guard against warrantless entry *onto premises* whenever contraband is viewed from off the

premises in the absence of exigent circumstances" (emphasis added)); *G.M. Leasing Corp. v. United States,* 429 U.S. 338, 354 (1977) ("It is one thing to seize without a warrant property resting in an open area . . . , and it is quite another thing to effect a warrantless seizure of property . . . situated on private premises to which access is not otherwise available for the seizing officer.").

As mentioned, Young primarily disputes the second prong of the plain view doctrine—that "the item's incriminating character must be immediately apparent"—because officers were not aware that he was a convicted felon at the time of the search. [R. 86-1, p. 4]; [R. 102, p. 7]; *see Loines*, 56 F.4th at 1106. The Sixth Circuit relies on three factors "[t]o determine whether an object's incriminating nature is 'immediately apparent.'" *Loines*, 56 F.4th. at 1108. These subfactors are:

> (1) a nexus between the seized object and the [suspected criminal activity]; (2) whether the intrinsic nature or appearance of the seized object gives probable cause to believe that it is associated with criminal activity; and (3) whether the executing officers can at the time of discovery of the object on the facts then available to them determine probable cause of the object's incriminating nature.

*United States v. Cozart*, No. 3:19-CR-123, 2022 WL 1117103, at *6 (E.D. Tenn. Apr. 14, 2022) (alteration in original) (quoting *United States v. Pacheco*, 841 F.3d 384, 395 (6th Cir. 2019)). Importantly, "[d]etermining whether an item's incriminating nature is immediately apparent does not demand an unduly high degree of certainty; rather, a plain view seizure is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity." *United States v. Wilkins*, No. 5:22-cr-00016-GFVT-MAS-1, 2022 WL 17548068, at *4 (E.D. Ky. Oct. 19, 2022), *report and recommendation adopted*, 2022 WL 16632967 (E.D. Ky. Nov. 2, 2022) (internal quotation marks omitted) (quoting *United States v. Calloway*, 116 F.3d 1129, 1133 (6th Cir. 1997)). "[N]one of these factors is necessary[; instead,] they are instructive[.]"

*United States v. Salto-Garcia*, No. 5:18-CR-44-REW, 2018 WL 3064279, at *4 (E.D. Ky. June 21, 2018) (alterations in original).

Considering the first subfactor, there is a clear nexus between the firearm seized and the suspected criminal activity, wanton endangerment. King, Larkey, and Rush all believed that they had seen Young waving a firearm out of his vehicle on multiple occasions during the pursuit. *See* [R. 100, pp. 25:1–9, 26:16–23, 27:6–8, 47:16–25, 48:2–9, 54:15–17, 58:13–21, 76:16–22, 77:19–21, 78:25, 79:1–6, 81:13–82:1, 84:11–12]. In addition, Alcorn testified that he "heard over police radio that the driver was brandishing a handgun." [R. 95, p. 21]; *see also* [R. 100, p. 115:3–5]; [R. 94, Pl.'s Ex. 2 (Larkey, at minutes 8:10–8:20 and 20:25–21:00, warning officers about a possible firearm and the driver's hands protruding from the vehicle)]; [R. 94, Pl.'s Ex. 4 (confirming that, during minutes 15:00–15:32, 16:15–16:30, and 17:36–17:50, officers were warned over the radio about the firearm sightings)]. Therefore, the officers "had a reasonable belief that Young had brandished a weapon while driving," which supports a charge for wanton endangerment. [R. 95, p. 18]; *see also Salto-Garcia*, 2018 WL 3064279, at *5 ("[L]aw enforcement was probing potential domestic abuse, and the alleged victim, in this context, had specifically tagged her boyfriend with firearm possession. A firearm—a deadly weapon—could be used as a tool, and could be evidence, of violence. A nexus between the seized object and the crime(s) of investigation existed."). Accordingly, there was a clear nexus between the firearm and the suspected criminal activity involving a firearm.

Even assuming that the second subfactor, whether "the intrinsic nature of a firearm [ ] automatically give[s] rise to probable cause of criminality,"[11] is unmet, the third subfactor—

---

[11] In the context of whether an item's "incriminating character is immediately apparent," older circuit case law mentioned that, "[i]f officers were able to clearly identify the object protruding from beneath the driver's-side seat as part of a handgun, then this prong of the plain-view test is satisfied." *United States v. Galaviz*, 645 F.3d 347, 355–56 (6th Cir. 2011) (citing *United States v. Campbell*, 549 F.3d 364, 373 (6th Cir. 2008)). However, other courts in this

whether the officers had probable cause to determine the firearm's incriminating nature—is applicable in this case. *See id.* (cleaned up); *see also Wilkins*, 2022 WL 17548068, at *5. This means that, "[t]he officers could, at the time of firearm discovery, and on the facts then available to them, determine there was probable cause of the [firearm's] incriminating nature and evidentiary value." *Salto-Garcia*, 2018 WL 3064279, at *5. Here, Alcorn testified that, given his training and experience, he immediately recognized that the object protruding from the backpack was part of a firearm. *See* [R. 100, p. 117:1–13]. Case law allows courts to credit the experiences of law enforcement officers when reviewing officers' probable cause determinations. *See Loines*, 56 F.4th at 1108 ("In considering whether evidence was 'apparent' to the executing officers, courts should be duly mindful of the executing officers' particular, subjective training and experiences." (quoting *United States v. Szymkowiak*, 727 F.2d 95, 98 (6th Cir. 1984))); *see also Pacheco*, 841 F.3d at 395–96 (quoting *Szymkowiak*, 727 F.2d at 98) (same).

Moreover, officers had been warned about multiple sightings of a firearm sticking out of Young's vehicle during the pursuit, *see* [R. 100, p. 81:1–4], and at least three officers testified that they believed at the time, and still believe, that they saw a firearm sticking out of the sunroof of Young's vehicle. *See id.* at 46:24–47:15 (describing how, on the day of the pursuit, King "[w]oleheartedly believe[d] with [his] training and experience that it was a firearm" sticking out of the sunroof)]; *id.* at 49:12–14 ("[W]ithout [the video] being blown up [by zooming in] . . . I do believe it was still a firearm."); *id.* at 60:1–4 (Rush confirming that he believes he saw a firearm during the pursuit on March 3, 2024); *id.* at 77:19–22 (Larkey explaining that he is "100 percent" confident that he "saw a firearm come up [the vehicle's] sunroof"); *see also Salto-Garcia*, 2018

---

district have continued to find that firearms are not automatically evidence of criminality. *See Salto-Garcia*, 2018 WL 3064279, at *5; *see also Wilkins*, 2022 WL 17548068, at *5.

WL 3064279, at *5 (finding "a reasonable basis to connect [the firearm at issue] with criminality when "[t]he purported victim [ ] alleged specific acts of violence by [the defendant] and particularly flagged [his] alleged firearm possession, and there were independent reports of a firearm, previously concealed in a vehicle's wheel well, possibly secreted away"). Alcorn was also aware of the officers' sightings of the firearm because he heard their warnings over the radio, [R. 100, p. 115:1–7], which he could rely on as the "collective knowledge" of the officers. *See United States v. Jenkins*, 266 F. Supp. 3d 980, 987 (E.D. Mich. 2017) (determining that "collective knowledge" of facts by officers provided probable cause for officer to search the defendant's vehicle); *United States v. Redmond*, 475 F. App'x 603, 607 (6th Cir. 2012) ("Probable cause for arrest may emanate from collective police knowledge." (citing *United States v. Perkins*, 994 F.2d 1184, 1189 (6th Cir. 1993)). Given these facts, the record supports the Magistrate Judge's finding that the firearm had an immediately apparent incriminating nature. *Galaviz* also supports this outcome. *See generally* 645 F.3d 347.

In *Galaviz*, the Sixth Circuit considered a challenge to the search of a vehicle reportedly involved in a robbery. *See generally id.* at 350–52. When officers approached the vehicle, which had no occupants inside, they "observed what looked like part of a handgun sticking out from under the front seat" through the window. *Id.* at 352. The officers asked a "wrecker service to unlock the car," and after the doors were unlocked, officers "seized a revolver located on the driver-side floor, partially under the seat." *Id.*

The defendant argued that "the seizure of the gun" did not fall under the plain view exception, and he appealed this issue once the district court denied his motion to suppress evidence of the firearm. *See id.* The Sixth Circuit analyzed whether the seizure was justified under the plain view doctrine, including "whether the incriminating nature of the gun was immediately apparent."

*Id.* at 354–56. The Sixth Circuit upheld the district court's denial of the defendant's motion to suppress the gun, in part because the court credited a deputy's testimony that he observed the "handled portion of what appeared to be a revolver sticking out underneath the driver's seat" from his position outside of the vehicle. *Id.* at 356–57.

Similarly, as explained above, Alcorn testified that he saw the butt of the firearm protruding from the backpack, and he immediately recognized that it was a firearm from his training and experience. [R. 100, p. 117:1–17]. And recall, immediately before observing the firearm, he had learned from other officers that they believed Young was brandishing a firearm outside of the window and sunroof of a moving vehicle. *Id.* at 115:1–7. Therefore, Alcorn was permitted by the Fourth Amendment to seize the firearm.

Alcorn was also able to seize the firearm, which was in plain view, based on his belief that the firearm would threaten officer and public safety. *Id.* at 117:21–24.

> "[A] police officer who discovers a weapon in plain view may at least temporarily seize that weapon if a reasonable officer would believe, based on specific and articulable facts, that the weapon poses an immediate threat to officer or public safety." *United States v. Bishop*, 338 F.3d 623, 628 (6th Cir. 2003). Given firearms' "inherently dangerous nature," this standard applies "even if a loaded handgun is legally possessed." *United States v. Atchley*, 474 F.3d 840, 850 (6th Cir. 2007).

*United States v. Culver*, No. 5:22-CR-20112, 2022 WL 17684318, at *1 (E.D. Mich. Oct. 18, 2022), *report and recommendation adopted*, 2022 WL 17682633 (E.D. Mich. Dec. 14, 2022) (alteration in original).

Because the plain view doctrine justifies Alcorn's seizure of the firearm, Young's objection will be overruled.

## IV.    CONCLUSION

In sum, the Court finds that the search and seizure of the firearm and ammunition was justified under the automobile exception, the search incident to arrest exception, and the plain view

doctrine. Accordingly, the Court adopts the Magistrate Judge's Recommended Disposition and overrules Young's objections. Accordingly, **IT IS HEREBY ORDERED** as follows:

1. Magistrate Judge Ingram's Recommended Disposition, [**R. 95**], is **ADOPTED** as the Opinion of the Court.

2. Young's Objections, [**R. 102**], to the Recommended Disposition are **OVERRULED**.

3. Young's Motion to Suppress, [**R. 86**], is **DENIED**.

4. Young's Motion to Expand the Record, [**R. 104**], is **DENIED**.

This the 27th day of May, 2025.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY